IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

William Edwards,                                  Case No. 3:15 CV 2073

              Plaintiff,           ORDER GRANTING
                                                  SUMMARY JUDGMENT
    -vs-
                                                  JUDGE JACK ZOUHARY
Secretary, U.S. Department of the Interior,

              Defendant.

Plaintiff William Edwards is a disabled Biological Science Technician who works for the United States Geological Survey (USGS). The USGS restricted his ability to work on boats, although he continues to work on land with the same job title and pay scale. Edwards believes the boating restrictions were based on unlawful discrimination and retaliation. The Government moves for summary judgment (Doc. 32), and the matter has been fully briefed (Docs. 31–33, 36–38, 40).

**BACKGROUND**

Edwards began working for the USGS in 2001 (Doc. 31 at ¶ 1). Among other things, he participated in scientific studies called "cruises" aboard USGS research vessels (*id.* at ¶ 5). In late 2001, he was injured in a hunting accident and was diagnosed with incomplete paraplegia (*id.* at ¶ 2). As a result, he was confined to a wheelchair until October 2002 (*id.* at ¶ 6). During that period, he remained employed at USGS, working in the laboratory and doing data analysis (*id.*). With informal accommodations, such as not requiring him to throw the trawl net overboard or load and unload heavy items, he resumed working on boats in 2003 (*id.* at ¶ 7).

In November 2004, the USGS hired Tim Cherry to be the captain of the Musky II -- one of the boats on which Edwards worked (*id.*). Although Cherry was the boat's captain, he was not Edwards' direct supervisor, and he did not make final decisions concerning Edwards' duties or accommodations (*id.* at ¶ 9). Nevertheless, Cherry allegedly did not want either Edwards or another disabled employee, Marty Stapanian, working on the boats. Indeed, an employee who worked at another location alleges that Cherry asked him in April 2005: "How do I get gimps and cripples like BILL [Edwards] and Marty [Stapanian] off of the boat?" (Doc. 36-4).

Three years later, in May 2008, Stapanian gave a presentation at a staff meeting on the Americans with Disabilities Act (ADA). At that meeting, Cherry allegedly stated his belief that "Stapanian and Edwards were 'unsafe' for many tasks on the boat because of their disabilities" (Doc. 36-3 at 3). He further added that "as captain he had the final say, 'no matter who,' regarding who can work on the boat" (*id.*).

In June 2008, Edwards was involved in a car accident and fractured two vertebrae in his neck (Doc. 31 at ¶ 21). Because of the accident, Edwards did not work on any boat in 2008 (*id.* at ¶ 23). In September of that year, in a memo Stapanian sent to Cherry's supervisor, Edwards was mentioned as a witness to Cherry's alleged misconduct -- including the statements purportedly made at the staff meeting mentioned above (*see* Doc. 36-1 at 27–28; Doc. 36-3). This apparently angered Cherry, who told Edwards' supervisor, Michael Bur, about the memo (Doc. 36-2 at 31). The memo was also sent to Bur's supervisor (*see* Doc. 36-1 at 20; Doc. 36-3).

Shortly after, in December 2008, Bur responded to an email from Edwards' doctor -- clearing him to return to duty -- with a letter requesting additional medical documentation (Doc. 31 at ¶ 27). Bur was concerned Edwards' doctor did not fully appreciate what would be required of Edwards on

the boats (Doc. 36-1 at 19–20). In response, Edwards provided a letter from his doctor indicating that he was progressing well in therapy and was expected to return to functional status by the spring (Doc. 31 at ¶ 28). Believing the doctor's response did not adequately address concerns about Edwards' ability to perform specific job duties, Bur again requested more information (*id.* at 29). This time, Edwards' doctor acknowledged he too was concerned about Edwards' ability to safely carry heavy items, throw the lower portion of the bottom trawl net overboard in heavy waves, and sample fish aboard a commercial fishing vessel (which requires significant agility) (*id.* at ¶ 30). These concerns were driven primarily by Edwards' impaired balance, which was likely a permanent condition (*id.*).

In June 2009, Edwards formally requested accommodations, asking that he not be required to perform the activities identified by his doctor (*id.* at ¶ 31). A few weeks later, a doctor for the U.S. Department of Health and Human Services reviewed Edwards' file (at USGS management's request) and issued a letter concluding both that Edwards was not medically qualified to perform the field work required by his job and that attempting to do so would threaten his well-being (*id.* at ¶ 32). He further noted that conclusion could best be confirmed by a functional capacity evaluation (*id.*).

Edwards then completed a functional capacity evaluation in August 2009 (*id.* at ¶ 33). The evaluation determined that Edwards was physically capable of performing the essential job functions of a Biological Science Technician, except for running (which was not required on the boats) (*id.*). The physical therapist who performed the evaluation also recommended that if Edwards needed to carry a box heavier than 66 pounds, he should use a dolly or cart (*id.*).

In September 2009, Bur notified Edwards that, after reviewing the results of the functional capacity evaluation, he determined that Edwards was able to perform his essential job duties (*id.* at ¶ 34). Thus, his request for accommodations would be considered and processed (*id.*). Edwards in

3

the meantime was temporarily granted the requested accommodations, and he participated in two cruises during the 2009 season (*id.* at ¶ 36).

In November 2009, Bur advised Edwards that his accommodations request would be modified due to a recent fall aboard the Musky II, along with other concerns (*id.* at ¶ 37):

> [W]hile performing duties at sea it was observed by management that you had difficulty maintaining your balance – struggling to lift trawl doors from the deck to the top of the port trail, and throwing the lower portion of the trawl overboard. Based upon this incident and real time observation since your functional capacity evaluation and implementation of your temporary accommodations, I am concerned that you may not be able to safely perform certain duties due to your inability to balance on a constantly moving platform with limited means to stabilize yourself.

The memo went on to list additional "accommodations" management deemed reasonable and effective, explaining that, although an employee has a right to an effective accommodation, the accommodation need not necessarily be the one requested by the employee.

Among the "accommodations" offered by the USGS was a requirement that Edwards maintain three points of contact with the boat -- that is, he must have both feet and one hand on the boat at all times or remain kneeling or seated if using both hands (Doc. 31-12 at 2). According to Edwards, this prevented him from feasibly performing his duties. Bur testified he does not recall with whom he consulted to determine that the proposed accommodations were reasonable; nor does he recall considering whether the accommodations would feasibly allow Edwards to perform his duties (Doc. 36-1 at 24–25). He also testified that, while making decisions regarding Edwards' accommodations, he was being torn by two "factions" -- one supporting Edwards against Cherry and the other (although not identified) presumably including Cherry and his supporters (*id.* at 27–29).

Meanwhile, shortly after Bur provided his memo offering additional "accommodations," a reviewing medical officer for the U.S. Department of the Interior issued a letter documenting her

review of Edwards' previous functional capacity evaluation (Doc. 31 at ¶ 40). In her opinion, because of the safety-sensitive nature of Edwards' work, the prior functional capacity evaluation did not take precedence over real-time observations or the documented incidents and concerns about Edwards' safety (*id.*; Doc. 31-13 at 2).

After receiving Bur's memo, Edwards decided not to continue working aboard the Musky II (*id.* at ¶ 39). He believed Bur's proposed accommodations were really restrictions calculated to keep him from performing his duties on the boat (*id.*). He nevertheless continued working on a smaller boat, the Bowfin (*id.* at ¶¶ 39, 41). He also filed an EEOC claim in February 2010, alleging that Bur's proposed accommodations were discriminatory (*id.* at ¶ 38). That complaint was investigated, and the EEOC determined Edwards was not subjected to the alleged discrimination (Doc. 20 at ¶ 5).

Bur retired in January 2010, at which point Patrick Kocovsky briefly took over as Acting Station Supervisor (*id.* at ¶ 42). Kocovsky testified that another USGS staff member, Andrea Stoneman, reported to him that Dale Hall (a crew member aboard the Musky II who allegedly was loyal to Cherry) told her "one of the reasons they were no longer working with [Edwards] was because of actions [he] took in collaboration with [Stapanian] about other complaints and concerns they had about the vessel crew, in particular, Tim Cherry" (Doc. 36-5 at 23–24).

In October 2010, the USGS initiated a program requiring crew members of large vessels to obtain medical clearance (Doc. 31 at ¶ 43). In addition to the medical clearance, which Edwards did not apply for or receive, the USGS Large Vessel Safety Program Management policy required those operating large vessels to have a U.S. Coast Guard Master's license -- which Edwards also did not have (*id.* at ¶¶ 45–46, 52). Fast forward then to April 2012, when Field Station Supervisor Richard Kraus informed Edwards that, because the Bowfin had been reclassified as a large vessel, he (and

others) could no longer operate the boat (*see id.* at ¶ 44). The next month, Kraus further informed Edwards that he was concerned about Edwards' safety when working aboard any of the research vessels (*id.* at ¶ 47). Because of those concerns, Kraus requested a second -- more detailed -- review of Edwards' medical records (*id.*). Based on that review, Kraus concluded there were no reasonable accommodations that could eliminate or reduce the substantial risk of harm Edwards posed to himself and others aboard USGS research vessels (*id.*). He therefore limited Edwards to performing land-based duties (*id.*).

Edwards filed another EEOC Complaint in July 2012, alleging discrimination and retaliation for his previous EEO activities (*id.* at ¶ 50). That complaint also was investigated, and the EEOC again rejected Edwards' claims of discrimination (Doc. 20 at ¶ 5). He filed this lawsuit in October 2015, and his Amended Complaint alleges claims for: (1) disability discrimination; (2) failure to accommodate; and (3) retaliation based on EEO activites. Edwards later voluntarily conceded he was no longer pursuing claims for failure to accommodate and retaliation (Doc. 39). Thus, his sole remaining claim (Count I) is for disability discrimination under the Rehabilitation Act, 28 U.S.C. § 791 (*id.*).

### STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). This Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Further, this Court does not weigh the evidence or determine the truth of any matter in dispute; rather, it evaluates only

whether the record contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

**ANALYSIS**

Americans with Disabilities Act (ADA) standards apply to cases alleging discrimination under the Rehabilitation Act. 29 U.S.C. § 794(d); *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002). To make out a *prima facie* case for employment discrimination under either Act, a plaintiff must show "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011); *Mahon*, 295 F.3d at 589. The Government disputes the second and third elements, arguing that Edwards was not qualified to work on the boats without the proposed accommodations and that the proposed accommodations do not qualify as an adverse employment decision (Doc. 39). But this Court need not determine whether the Government is correct as to these issues, because it finds that Edwards has not provided sufficient evidence to create a material issue of fact as to whether the allegedly adverse action resulted from unlawful discrimination.

"Once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Id.* at 259 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Assuming for purposes of this Motion that Edwards has made out a *prima facie* case, the Government has articulated a non-discriminatory explanation for its decision to limit Edwards' participation on the boats -- safety

concerns based both on medical opinions and observations aboard the boats. Edwards therefore has the burden of proving that the safety concerns cited by Bur and Kraus were pretextual, and that discrimination was the actual motivation for limiting his participation on the boats.

Edwards cites no evidence that either Bur or Kraus harbored any discriminatory animus toward him. Rather, his discrimination claim rests on an inference that Cherry's alleged discriminatory animus influenced the decisions made by Bur and Kraus. Under this so-called "cat's paw" theory of liability, Edwards must show that Cherry's discriminatory actions were a but-for cause of the decisions to limit his work on the boats. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) ("[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [the Act]."); *Goodsite v. Norfolk S. R.R. Co.*, 573 F. App'x 572, 585 & n.7 (6th Cir. 2014) (suggesting that the causation standard for the underlying statute applies under a "cat's paw" theory of liability); *Lewis v. Humbolt Aquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (but-for causation is the standard for ADA claims).

As evidence of Cherry's discriminatory intent, Edwards points primarily to the question Cherry allegedly posed in April 2005 about how he could get "gimps and cripples" like Edwards off the boat, as well as Cherry's statement to Stapanian in May 2008 that he thought Edwards was unsafe to have on the boat because of his disability (Doc. 36-3 at 3; Doc. 36-4). Both of those comments, however, occurred more than a year before the first decision to limit Edwards' work on the boats back in November 2009. And the Sixth Circuit has held that isolated statements, such as Cherry's, are too remote to support a finding of discrimination when they were made more than a year before the alleged adverse action. *See, e.g.*, *Parks v. UPS Supply Chain Solutions, Inc.*, 607 F. App'x 508, 517

(6th Cir. 2015) ("Generally, this court does not accord great weight to comments made over a year before the termination at issue. . . . Such statements do not demonstrate pretext because they are too far removed from the decision-making process."); *Rosso v. A.I. Root Co.*, 97 F. App'x 517, 520 (6th Cir. 2004) (statements made more than six months before discharge were too "isolated and abstract" to support a finding of discrimination); *Kahl v. The Mueller Co.*, 173 F.3d 855 (6th Cir. 1999) (table) ("The remaining two remarks are 'stray remarks' which are insufficient to give rise to an inference of discrimination as they are temporally and topically distant from Kahl's termination"); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025–26 (6th Cir. 1993) (comments made eight months before discharge were too isolated and ambiguous to support finding of discrimination). Accordingly, this Court finds that Cherry's alleged statements are too temporally remote to support an inference of discrimination.

Because Cherry's statements cannot support an inference of discrimination, and there is no evidence in the record suggesting that Bur or Kraus harbored discriminatory animus toward Edwards, this Court finds that the evidence is insufficient to show that the safety concerns cited by the USGS were pretext for unlawful discrimination. And because Edwards has acknowledged he is pursuing no other claims (Doc. 39), the USGS is entitled to judgment on all claims as a matter of law.

## CONCLUSION

Cherry's statements, if true, are concerning. But those statements alone, considering their temporal distance and the fact that they were not made by the ultimate decision maker, are not enough to allow a jury to infer that the boating restrictions were a pretextual justification for unlawful discrimination, especially when balanced against the lengthy period in which accommodations were

given to Edwards to allow him to continue working on the boats.  Because Edwards cannot meet his burden of proof, the Complaint is dismissed.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 31, 2017